## Chesapeake & Ohio Railway Company v. Meek.

(Decided May 2, 1916.)

### Appeal from Johnson Circuit Court.

1. Railroads—Fires.—It is the duty of a railroad company under section 782, Kentucky Statutes, to equip its engines with the latest approved appliances and spark-arresters in use to prevent the unnecessary escape of sparks producing fires along its right of way and to maintain and keep them in reasonably good condition, and if it should fail to do so and a fire should occur resulting in the destruction of property, the company will be liable to the owner to the extent of the value of the property destroyed.

2. Railroads—Fires—Damages.—In a suit to recover for the value of property destroyed by fires produced by the escaping of sparks from an engine of a railroad company, it is competent for the plaintiff in order to show. negligence on behalf of the company to prove that other fires in the vicinity occurred shortly before or shortly after the fire producing the damage, as well as. to show the quantities and sizes of cinders thrown from the engine of de-

fendant at such times, as bearing upon the condition of the engine causing the fire on the day it occurred.

3. Railroads—Question for Jury.—Evidence examined and held that a peremptory instruction for the defendant should not have been given, but that is was proper to submit plaintiff's case to the jury under approved instructions.

M. C. KIRK, F. T. D. WALLACE and WORTHINGTON, COCHRAN & BROWNING for appellant.

J. F. BAILEY for appellee.

Opinion of the Court by Judge Thomas—Affirming.

On September 4, 1913, the appellee's dwelling house located in Johnson county, Kentucky, about 74 feet from the track of the appellant, was destroyed by fire, which occurred between 12:30 and 1:00 o'clock P. M. on that day. Charging that the fire was due to the negligence of appellant both in the operation of its engine and in suffering and permitting the same to be out of repair and not to have been equipped with the latest approved spark-arresters and appliances, as is required by section 782 of the Kentucky Statutes, thereby causing the fire, this suit was filed in the Johnson circuit court to recover the value of the house so destroyed and the value of its contents, the total sum being fixed at $2,500.00. During the progress of the cause the amount sued for was abated by the sum of $500, being the value of the contents of the house, but the suit progressed to recover the value of the house, it being fixed at $2,000.00. There was a judgment for the plaintiff in the sum of $1,600.00, and the appellant failing to obtain a new trial in the court below, prosecutes this appeal. The answer is a general denial.

But two grounds for reversal are urged upon us, they being: (1) That the court should have peremptorily instructed the jury to find for the appellee, and (2) incompetent evidence introduced before the jury by appellee over the appellant's objections.

The facts disclosed by the record are substantially as follows: The property destroyed, at its nearest point, was situated about 74 feet from the railroad track and the foundation of it was about 20 feet above the railroad track, it being located on the side of a hill. The building was one story and a half high, but there were rooms above the first story, there being eight altogether.

The roof of the front part of the building ran parallel with the railroad track, there being an ell running back from the front part in which were located the kitchen and dining room. It was a frame building and weatherboarded on the outside and papered in the inside, and the kitchen flue was located in the ell part of the building and in the end thereof farthest from the railroad track. The dinner had been cooked that day on the stove, the pipe of which ran through the flue in the ell, but the dinner was over with at about 10:30 o'clock, it having been served early on that day for reasons stated by the witnesses and not necessary to restate here. Coal was used in cooking this meal. The flue was made of rocks laid in cement, and according to the testimony was an excellent flue and perfectly safe. The flue had a top to it, which ran parallel with the roof of the front part of the house, thereby preventing anything from escaping from the flue except at the two ends of this top and so arranged that nothing could escape through the sides of the top. The fire was discovered just over the comb of the roof to the front part of the house farthest from the railroad track, and at a point something like 19 or 20 feet from the flue. The roof was a board roof, and when the fire was first discovered, it was in the point of the roof described, and was something like 10 inches in diameter. This discovery was made, according to the testimony, between fifteen and thirty minutes after a freight train had passed, which, under the proof, was drawn by a very large engine, number 457. Just as this train was passing, a son of the plaintiff was standing upon the front porch next to the railroad track, and he testified as to the character of the train, it consisting of about 55 or 60 empty gondola freight cars. Immediately in front of the house is a curve, upon the outside of which is the house that was destroyed. This witness did not observe any unusual or other character of cinders being thrown from this train, explaining that he paid no attention to this and that it was in the bright sunlight and he doubtless could not have seen them had he directed his attention especially to it. Another son testifies to practically the same, but he did not appear upon the porch until the engine had passed the house the distance of about one-half the length of the train. The smoke from the fire went in the direction of the railroad track, showing that the wind at the time was blowing

towards the track from the house. It is not shown, how-
ever, with what force or velocity the wind was blowing
nor is it shown in what direction it was blowing at the
time the train passed the house. The first person to
arrive after the discovery of the fire went into the house
and into the rooms immediately under the fire, and there
was no evidence of fire in any of these rooms, nor was
there any fire located near to the kitchen flue. It is
shown that in going around this curve the engines pull-
ing a train of the character and size of this one, are
compelled to exert themselves more or less, and persons
who saw this train from one-half to a mile in either di-
rection from the destroyed property on this particular
occasion, say that it was pulling heavily, and, to use their
own language, "doing considerable chugging." This is
explained to mean that the exhaust is actively at work,
and when so, its tendency is to throw out cinders to a
greater extent than when not so working. There was a
fence around the house and at the rear near the fence
were some bee gums. The part of the fence at the rear
of the building, as well as the bee gums, was destroyed
by fire, but the fence at the front of the building and
next to the railroad was uninjured by the fire; however,
the rear fence and bee gums were considerably elevated
above the front fence and therefore more nearly on a
level with the burned building.

A few days after the fire the son of the plaintiff, Mil-
lard Meek, whose age is not shown, but it is shown that
he is a married man, learned from the records made by
the agent of the company, that the engine drawing this
particular train was number 457, and it is conceded by
both sides that if the company set the property on fire at
all, it was with this engine. With a view to ascertain the
equipment of engine 457, as to appliances for arresting
sparks, and as to the state of repair of such appliances,
Millard Meek, procured a witness to ride one night on
a train being drawn by that engine from Paintsville to
Louisa, a distance of about thirty miles. This witness
took a position on the train about four or five car lengths
back from the engine, and he testified that on that trip
the engine emitted not only large quantities of sparks,
but they were of large and unusual size, some of them,
as he states, making a light as large as a roman candle.
Jeff Meek, another son of plaintiff, testified that some
three or four days after the fire he saw an engine pass

in this immediate vicinity which was of the same size, type and class of engine 457, and it was throwing large and unusual quantities of cinders, but he had not learned at that time the number of the engine which passed the house upon the occasion of the fire and did not observe whether the one he saw was that number or not. However, it is shown that the appellant at that time had in use, over this particular part of its road, several engines of this same type, which are stated in the record to be of class "G Seven," and that they were each and all of them similarly equipped with appliances for arresting sparks. Some 60 or 70 feet to the left of the dwelling house is a storehouse situated some 60 feet from the railroad track. Twenty-eight days after the fire, Willard Meek and another witness, learning that engine 457 would pass on that day, stood in front of the store to observe whether or not cinders escaped from it, and if so, their quantity and size. They state that an unusual quantity did escape from it and they picked up some of them and exhibited them on the trial, they being, according to the testimony of these witnesses, about the size of a man's thumb. On the 2nd day of March, 1914, being practically six months from the time of the fire, there was a snow on the ground and Willard Meek and other witnesses went to the spot occupied by the house before it was burned and found in the snow considerable quantities of cinders of the size before mentioned, and these were testified to, as well as exhibited, upon the trial. The engineer who operated the train testified that it was in good order and that if it had been out of repair to such an extent as to have permitted the escape of a cinder as large as a man's thumb, he could have discovered it by the way the engine steamed. This, however, was contradicted by a witness for the plaintiff introduced on rebuttal, who says that he has served in the capacity of locomotive engineer for a number of years and that it would be impossible for the engineer to have discovered any such defects from the working of the engine. It was shown by witnesses for the appellant that this particular engine had been inspected on August 30, preceding the fire, also on September 11, September 20, and October 20, and that these inspections showed, according to the witnesses, that the equipment for the arresting of sparks was not only in good repair but properly adjusted. These and other witnesses say

that the meshes in the netting constituting the surface of the spark-arrester are about one-fourth of an inch square, so that it would be impossible for a cinder smaller than this size to get through them. Witnesses testified that at the time of the fire the cooking stove, to use their language, "was dead." By this it is explained that the fire had almost gone out and the stove could be handled by them in carrying it out of the house.

With the evidence being substantially as we have stated, should the first contention of appellant be upheld? Manifestly, in this character of suit the plaintiff must in most cases establish his claim, if at all, by circumstances having a probative bearing upon the issue as to the cause of the fire. It is in the rarest instances that it can be shown by direct testimony that a cinder from an engine set the property on fire. The tribunal trying the case is entitled to be given all relevant facts from which the truth of the matter may be ascertained. If, however, from the whole case it can not be reasonably concluded that the fire was caused by the negligent acts of the railroad company, the case should not be submitted to the jury; but if from all the testimony it can be reasonably concluded that the railroad negligently caused the fire, and that the testimony leaves in the mind of a reasonably fair man a well founded doubt as to how the fire originated, it is then the duty of the court to submit the case, under proper instructions, to the jury. This is not in conflict with the previous opinions of this court in such cases, but, on the contrary, is in perfect harmony with them. When a peremptory instruction in behalf of the defendant has been ordered or sustained by this court, it was on the particular facts of that case, the court recognizing that the facts of each case determined the law that should be applicable thereto. And so, when all the testimony showed that it was impossible or exceedingly improbable that the fire was caused by any act of the defendant, the case was taken from the jury, as in the case of C., N. O. & T. P. Ry. Co. v. Sadieville Milling Co., 137 Ky., 568, in which no one saw the train pass which was supposed to have set the property on fire, and there was no testimony as to sparks coming from any of appellant's trains, nor was there evidence of any sparks or cinders having been found in the vicinity of the destroyed property. See also Central City Foundry & Machine Co.

v. I. C. Ry. Co., 156 Ky. 759; and L. & N. R. R.. Co. v. Hamburg-Bremen Ins. Co., 152 Ky. 510. In the last case referred to it is said:

"No sparks or cinders of any kind were picked up in the vicinity of the Lawrence home or between it and the railroad. There was not only no evidence that any, one of the locomotives of the train emitted sparks, but, there was no evidence going to show that the particular engine on any one of these trains had a short time be-. fore or after the fire emitted sparks."

The court then continues to show that there was a much greater probability that the fire in question originated from either the stove-flue or the chimney to the house than from any other source and especially than: from any act of the defendant. And upon the same point in the Sadieville Milling Co. case, this court said:

"In the case under consideration no one saw any of appellant's trains pass by on the night of the fire; no one testified as to sparks coming from them; no one was there to witness as to how the trains were managed or operated. There was no testimony that any sparks were found in the vicinity of the fire. No large cinders. were picked up near the barn."

And the same is true as to the case of I. C. R. R. Co. v. Schibble, 72 S. W. 325, upon which, and the other cases referred to, appellant chiefly relies.

In the case we have before us it is indisputably shown that engine number 457, which is conceded by everyone to have set the property on fire, if any engine did it, upon several occasions closely following the fire, emitted large cinders and in unusual quantities and this, too, near to the time when it is alleged to have been inspected by the witnesses for the defendant who found it to be in good order. Other engines of the same type and size and of the same class are also shown about that time to have emitted the same character of sparks both as to size and quantity. It is shown that it is exceedingly improbable that this fire originated from the flue of the cooking stove. It was not only found to have been on top of the roof, but about 20 feet from the flue and at the side of it where it was almost impossible for the fire to have been produced by sparks from it. As we have seen, the ends to the top of it opened at right-angles from the direction of the fire, to say nothing about the fire in the stove having died down and become

almost entirely extinguished for some time before the fire which burned the building was discovered. The fact that the wind was blowing the smoke towards the railroad track is not a conclusive circumstance that the engine did not set the house on fire, because it is not shown with what force the wind was blowing, or that it was blowing at all in that direction, at the time the train passed. It must not be forgotten that in many of the cases where recovery is upheld, the destroyed property was located much farther from the railroad track than it was in the instant case, and there can not, therefore, be given any force to this circumstance. Nor does the elevation of the house above the railroad track militate against the contention of the plaintiff. The place where the fire started was not exceeding 15 or 20 feet above the top of the smoke stack, and cinders from the engine, under the proof, and from general observation, could as easily find lodgment at this elevation as they could upon a level with, or below, the smoke stack of the engine. Indeed, there is proof in this record to show that the sparks from this particular engine about one week after the fire, ascended to an elevation of seventy-five feet above the top of the smoke stack. We are of the opinion that in view of the rulings of this court in the cases *supra*, and many more which we might cite, there was sufficient evidence to justify the submission of this case to the jury under proper instructions, and that the peremptory instruction offered by the appellant should not have been given.

Serious complaint is made as to the introduction of testimony to the effect that engine 457 upon subsequent occasions to the fire, emitted large quantities of sparks and of unusual size. Particularly is this complaint directed to the testimony of Willard Meek, as to the cinders coming from that engine on October 2, and as to the cinders found upon the building site in March following the fire. That it is permissible for plaintiff to show that the particular engine charged to have set the property on fire, just prior, or subsequent to that time, had been throwing out unusual quantities and sizes of cinders, under the opinions of this court, is well settled. Taylor v. L. & N. R. R. Co., 19 Ky. Law Rep. 717; I. C. Ry. Co. v. Scheible, 24 Ky. Law Rep. 1708; C. & O. Ry. Co. v. Richardson, 31 Ky. Law Rep. 786; I. C. Ry. Co. v. Hicklen, 131 Ky. 624; C. & O. Ry. Co. v. Preston,

143 Ky. 189; L. & N. R. R. Co. v. Guttman, 148 Ky. 235; L. & N. Ry. Co. v. Home Ins. Co., 146 Ky. 281.

In the last case above the fire in question occurred on June 8, 1910. Evidence was introduced by the plaintiff as to fires being produced by sparks in unusual quantities and sizes through the fall and winter of 1910, and as late as February, 1911. It was not shown in that case as to the engine from which the sparks came, but train No. 5 was the one charged to have set the property on fire for which the suit was brought, and it was alleged that the introduction of this testimony was highly prejudicial to the defendant. Upon that question, however, as well as the reasons for the permission of the introduction of prior or subsequent fires, and of prior or subsequent throwing of cinders, this court said:

"The general rule is that it is competent to show in chief that other fires were started by sparks from locomotives operated by the company, shortly before as well as shortly after the fire in question. This evidence is admitted upon the theory that it tends to show a negligent habit or custom of the company in not maintaining in proper order its spark-arresters, or in negligently operating its trains. And the evidence introduced by the railroad company serves to explain the reason and propriety for the admissibility of evidence of other fires in rebuttal. It proved by a number of witnesses that all of its engines that operated trains along this road were at the time of the fire, and had been for many months before and afterwards, equipped with spark-arresters of the same kind and the latest and most approved pattern; and, that it was not possible for live sparks large enough to start a fire on Spencer's house to escape through these arresters. When a railroad company introduces this character of evidence, and relies on the continuous sufficiency of its equipment, the plaintiff may for the purpose of showing the inadequacy of the spark-arresters and rebutting the evidence of their sufficiency for the purpose intended, show the existence of other fires started by sparks from engines so equipped, and it is admissible under this rule to extend the inquiry as to other fires for a reasonable period before and after the fire being investigated, if there is evidence showing continuous acts of negligence in this respect. No exact standard can be laid down as to the period of time it would be proper to embrace in the in-

quiry along this line. This is a matter that necessarily addresses itself to the sound discretion of the trial judge, and its competency must be controlled in a large measure by the character of evidence offered. Kentucky Central R. Co. v. Barrow, 89 Ky. 639; Stowe v. L. & N. R. Co., 140 Ky. 291; C., N. O. & T. P. Ry. Co v. Sadieville Milling Co., 137 Ky. 568.

"It is also competent for the purpose of showing the size of sparks that may be thrown out of the smoke stack through the spark-arrester to produce evidence of the size of the cinders that are found in the vicinity where the fire occurred. C., N. O. & T. P. Ry. Co. v. Cecil, 28 Ky. Law Rep. 830. We are inclined, however, to think that evidence of the fires in January, 1911, and in the winter and late fall of 1910 should not have been admitted, as these fires were too remote from the fire in question. But, it was so satisfactorily shown that the house was set on fire by sparks from the engine pulling train No. 5 that this evidence was not prejudicial."

From what is therein said, we are clearly convinced that the testimony as to the finding of the cinders in March following the fire in the snow upon the site of the burned building, should not have been introduced, but as is stated in that opinion, this could not have been prejudicial inasmuch as it was not shown that these cinders were thrown, at the place where found by engine 457, the one which it is conceded ignited the building, if any one did. Moreover, there was less reason for excluding this testimony in the case which we are considering than in the case just referred to, because it is insisted by appellant that the meshes to spark-arresters in all of its engines are the same and have been, with the type of engine to which No. 457 belonged, and that these spark-arresters were not only adjusted in the same manner in all of the engines, but that it kept all of them in perfect repair, and that it was, therefore, practically impossible to throw a cinder of the usual size as far from the track as was the house that burned, and completely impossible for any of its engines to throw so far, a cinder of the size of those found at that point. The testimony might have had some relevancy towards refuting this contention; but it would have been proper for the court to have told the jury the purpose for which it was introduced, if requested to do so. Be that as it may, we do not believe, as stated in the Home Insurance

case, that this evidence was of sufficient prejudice to the rights of the appellant to justify us in ordering a new trial. We can readily imagine, however, a case where the facts would render it highly prejudicial for the jury to hear this character of testimony; so much so that a judgment obtained therein could not be permitted to stand on a motion for a new trial. It is therefore plain that counsel are dangerously tampering with the rights of their clients in offering such testimony and courts are jeopardizing their judgments in permitting its introduction. We, therefore, would admonish both attorney and court of the danger attending such experiments.

There is no complaint made as to the value of the property destroyed.

It results, therefore, that the judgment should be and is affirmed.